May it please the Court, I am Joshua Glellen, appearing on behalf of the claimant under the Longshore Act here. Mr. Hart worked for Matson for many years and had progressive hearing loss in the course of his work, of which Matson was fully aware, but as to which it never took any steps to discharge its known existing liability under the Longshore Act at the time it performed the screening audiograms that it did in the course of his work. Matson defaulted on its duties under the Longshore Act year after year, and then when he left its employ, it not only did not pay him the compensation that it had every reason to know that it owed him, but it also did not offer him a post-retirement audiogram to fix the extent of his compensable hearing loss. As we view the case, the result of their failure to do so is that it has no way to rebut the presumption of causation of the full hearing loss shown on the first post-retirement audiogram, which was not performed until seven years later.  GOTTLIEB Well, counsel, there was evidence from the doctor that in the 17 months before he retired, that he had been changed to a job which didn't involve a terribly noisy environment. MR. GOLDSMITH No, I don't think there's any evidence to that effect. In fact, I think the employer acknowledged that his noise exposure in that final 17 months was the same, essentially, than I think the ALJ explicitly. MS. GOTTLIEB In some part of the record, I read that he was changed to a job as a mechanic, and the doctor thought that very little, if any, additional  MR. GOLDSMITH This expert witness' testimony to that effect was not based on any change in job assignments. In fact, Mr. Hart worked inside a steel, a corrugated steel building where the noise exposure was at a pretty extreme level. Even for those last 17 months, I think my brother Hug will confirm that the employer did not dispute that there was still very serious noise exposure in that final year and a half. The doctor's, the employer's expert witness' testimony was that any further loss of hearing in those final 17 months would have been, I believe he used the phrase, minimal at best. The ALJ and the board, however, recognized that the audiograms did show a consistent pattern up through the one performed a year and a half before he left the work of an increase of 2 or 3 percent each year. Now that would not certainly have brought him up from 20 percent 18 months before he later. We'll grant that. And if the question is would it have been a reasonable inference to say when he left work his hearing impairment was on the order of 24 percent, several percent more than the audiogram showed a year and a half before he left the noise exposure, that would be a reasonable inference. Now why none of the administrative tribunals ever makes that kind of an interpolation is not a question that anyone has presented here. Apparently their view is that an extent of hearing impairment determination has to be based on a particular audiogram, not on interpolation between other audiograms or interpolation of the values on an audiogram that didn't do this relatively unusual 3 kilohertz testing which apparently audiograms don't do unless they're directed to the AMA or OSHA requirements. Let me understand, and I'm going to take a little bit different tack, but generally coming back to where you are. It's my understanding that the language of the statute, 908C.13c, and the regulation 20 CFR 702441B would suggest that an audiogram is presumptive evidence of hearing loss as of the date of the audiogram, and thus if we had a valid audiogram that was taken at retirement, that could be presumptive of evidence of occupational hearing loss. Certainly correct. However, we didn't have that at retirement. All we had were audiograms taken before retirement and audiograms taken after retirement, correct? Yes. And so at that point we're really saying, did the ALJ who had all this evidence in front of him, did he, was there substantial evidence to sustain what he did in relation to having different audiograms he had to look at or that he didn't look at? Isn't that true? Yes and no. I nearly agree with that, Judge Smith. What's missing from it, I think, is certainly the ALJ had the authority to find and reasonably did find that the last audiogram before Mr. Hart left employment, even though it didn't qualify to be presumptive evidence under the statute. Well, in fact, the ALJ says, I can't give it presumption. Yes. I'm not going to give it what the presumption is under these statutes and regulations, but I've got to look at all the evidence. Yes. And I've got to make, in fact, a factual determination. And if it's supported by substantial evidence, then I don't think I'm supposed to supplant his view, am I? No, you're not. Well, and I guess here's the problem that I have. Then I review his, I don't review his decision, really. I review the board's decision for errors of law and adherence to a substantial evidence standard, and the board was to review his decision under substantial evidence. So if, in fact, I find that the board adhered to the substantial evidence standard, am I not then boxed? There's no way for me to do anything in this particular matter? If indeed his decision is rational and based on substantial evidence. But it depends on what the question. Substantial evidence is relevant evidence, as a reasonable mind might accept as adequate to support the conclusion, is it not? Yes, it is. So, and if, in fact, the board adhered to the substantial evidence standard, suggesting what substantial evidence is, then I'm boxed. Even if I would not agree, even if I'd like to say, boy, I was up there in Portland and this guy gave me a great argument and he's given me a good one now, I would nonetheless be boxed, because if they adhere to the standards, I can't supplant my own idea. Unless, of course, the ALJ's treatment of the evidence is not rational. It has to be rational. And your best argument is the ALJ and what he did in this situation is, was totally irrational. Well, I don't, again, no, as I said earlier, it's not totally irrational. I think he is well within his, perfectly reasonable to say the last audiogram before Mr. Hart left employment is an accurate reflection of what his hearing impairment was then. Now, if the next question is, is that or one of the subsequent audiograms a better reflection of what his hearing impairment was on his last day of work, then, yes, that would be, that also is a rational determination, that the one performed 18 months before is a better reflection than the one performed seven years later. But that's not the factual question. Now, let me ask you one more question, just to make sure. I don't see Bath Iron Works changing this at all, even if Bath Iron Works is relied upon by me. I do not find anything in Bath Iron Works which takes away from the general discussion you and I are now suggesting, which is, some things are presumptive, that they had something there, they would have had it, but they didn't. Now we have nothing, and therefore, all I have to do is see, again, does the, is there a presumption on ALJ's decision? Well, what I think Bath Iron Works captures, and I apologize, I'm afraid I've misled you by using the word presumption and not specifying what I was talking about. I was not talking about the presumptive evidence provisions of Section 8C13 about audiograms. I was talking about the general presumption of compensability under Section 20A of the Act. That is a presumption of causal relatedness. Now the claimant comes before the ALJ with a 2004-2005 audiogram and says, I assert that this is due to my employment. The burden of going forward with evidence sufficient to show that it is not causally related to his employment is on the employer. Once that legal framework is in place, what the Supreme Court said in Bath Iron Works about the way the employer can protect itself against becoming liable for post-retirement hearing impairment that's just due to aging or any other cause, the way it does that is to perform an exit audiogram, which they did not. But that doesn't say you have to. It just says that what we've got here now, back to the bull point, we don't have one here, therefore, not having one gets us back to the same old thing we had prior. The old ALJ has to determine whether it's presumptive or whether it isn't, and if it isn't, try to lay out the substantial evidence why he makes the decision he makes. No, I think that's wrong, because I think in order to constitute competent evidence to show what portion, if any, we would acknowledge some portion, what portion, if any, of the further progression of the hearing impairment after Mr. Hart left work, the only way it can show that without simply speculation is to have an audiogram performed, which it did not do. Now, Dr. Schindler, the employer's witness, agreed on the record, you cannot predict how much further hearing impairment a worker will suffer from further noise exposure. His testimony about the loss of hearing becoming more subtle as time goes, as noise exposure goes on, was all in generalities. He couldn't relate that, there's no way to relate that to individual cases, which vary. The pattern of the audiograms during the course of the employment, in this case, shows no leveling off. It shows a consistent deterioration of Mr. Hart's hearing over those years, not the leveling off that Dr. Schindler said was the usual pattern. He also testified that as long, even though it becomes more subtle over time, with further noise exposure, the hearing continues to deteriorate. Thank you, counsel. Your time has expired. Thank you very much. Good morning. May it please the Court. My name is Frank B. Hug, and I represent Matson Terminals. One ALJ, not this case, upon hearing Dr. Schindler's testimony, stated, the human ear is a wonderful organ. Indeed, what we're dealing with in this case involves the measurement of some 40,000 hair cells that are in the middle inner ear of the cochlea, and that have been exposed to noise, retract, flop over, and die. The AMA, the Longshore Act, provides a very specific scheme for measuring those physiological changes that occur, and to provide benefits to claimants under the Act for exposures to loud noise, namely, audiograms that meet the AMA requirements of eight mandatory frequencies, eight mandatory measurements, four different frequencies in each ear. All the claimant had to do in this case was go forward with his burden of proof, which was to prove the extent of disability. In the Supreme Court decision of Bath Ironworks, the nature of the disability was determined. It is a scheduled impairment, compensable as a percentage of 200 weeks, 200 weeks being total deafness. All the claimant had to do was carry his burden of proof as to the extent of disability. There were conflicts among the evidence about the extent of disability. Seventeen months before the claimant stopped work on account of a serious orthopedic injury, he did not retire, he stopped work on account of another injury. Seventeen months before there's an audiogram that establishes a 20 percent loss. Seven years after, there's another audiogram that establishes a loss nearly double that amount, 39 percent. The ALJ looked at those and I think 17 or 16 other audiograms over three decades. He sifted through the evidence, he listened to Dr. Schindler, and he made a fairly abstrute conclusion based on Dr. Schindler's testimony about the nature of hearing loss and what that means. And that's what does not dispute. There is no causation issue here. This is solely an issue of the extent of impairment. The judge made a... You argue an alternative causal theory as to the cause of the hearing loss post-retirement? No. Was that argued below? No. So we just have the two measures. We have the pre and post, and we have, as you've considered properly, that there's a causal link has been established as the employment. But we don't know, and there's no explanation on the record, what else could have caused the rapid hearing loss, except for speculation, right? No, no. There is testimony in the record of Dr. Schindler about that. It could be metabolic, it could be... Correct. I mean, there's no single theory that you've urged. It could be metabolic, it could be this, it could be that. We don't know. Correct. So given the disparity between what the hearing loss was when he stopped work because of another injury, the judge had to make the choice. I don't deny that those other factors there, I don't deny that it's an imprecise science. Medicine seemingly always is. But that leads to the question, is this court, is the BRB, going to go through the process that is suggested by the briefs and in part by what argument? Well, let's take every one of the measurements and look at the DB and see if they fall within the 5 or 10% test retest variability. The judge is the one charged with that. I understand that there. What I was leading to is I'm trying to make some sense out of what the Supreme Court was saying in Iron Bath Works. And I agree, it doesn't mandate the employer, it doesn't require the employer to take a test. But in a sense, it seems to imply that post, if the employer does not have an examination or have conducted an examination just before retirement, that the post, the workers' post-employment audiogram is entitled to a little more weight. Well, I mean, that's, again, one could read a lot of stuff into that, but why else would they put it in there? What the, I think it was Justice Stevens said, that this is a way that the employer could protect himself were he to conduct the audiogram at exit, implying that other evidence would, could become critical and adverse to the employer. Both questions are right on the mark of exactly what the Supreme Court said in its dicta. The employer can freeze, was the exact word, its liability. But if, I went back and I re-read three times last night Bath Iron Works before I could find the sentence, because there are about six other pages upon which the Supreme Court goes through the highly technical process of deciding in Bath Iron Works which system of compensation applies in reaching the holding that it is a scheduled award. I don't think Justice Stevens was trying to establish a framework for the circuit courts or other, or the ALJs or the boards to determine how much impairment will be awarded in each case. In fact, it says, the computation of the amount of benefits is a matter not in dispute in this case. So that is one we, one means, if it happens, that can be used to assess close to stopping work, but it didn't happen in this case and we, as, and. Roberts. No, I mean, I just, it's sort of a curious because it's arguably dicta, but on the other hand, we have to pay attention to Supreme Court dicta. I mean, I think that's a, and it seems to imply, that's, I mean, it seems to imply that perhaps the worker is entitled, because of the presumption nature of the scheme, that the worker gets a little, more weights accorded to an audiogram tendered by the worker post-employment if the employer doesn't. I'm glad you took it to that extreme because I don't think it does imply that. Your question implies that only, which is the claimant's argument, only a post-stopping work audiogram. No? No, I just, it's a question of how much, what's a, what weight you put on the evidence. Well, the. Perhaps. None of the courts, none of the circuit courts, and not this Court, have ever established a rule that there should be more weight entitled to the post-employment audiogram. No, I understand. None of them have decided. That's this case, though. None of them have decided that there should be more weight attributed to the pre-employment audiogram. All of them say, all of the court's cases, reported cases on this arcane area, hold that it's a weighing process. So I don't have a. I agree with you right up to that point. And then I'm, when I look at that, is, is, if the employer doesn't conduct the audiogram, per Justice Stevens' suggestion, is the post, is a post-termination audiogram tendered by the employee entitled to more weight under the statutory scheme. That's the, not that it's presumptive, not that it, but in terms of NALJ's analysis. Two reasons it should not or could not, should not be interpreted in that fashion of Justice Stevens. One, it'll upset the entire apple cart of the substantial evidence rule, which we've heard, which is what it's all about. But secondly, that's not how it works in the, in the everyday world of the waterfront or all other industries that inevitably and unfortunately, unavoidably involve loud noise. It's the nature of industry. And this man was injured, stopped working and retired two years later. There are, there are union regulations, there are rules, there's OSHA conservation program, which is how Mattson diligently complied with another law, OSHA, not for the purposes of establishing claims under the Longshore Act, but to try to improve the overall acoustical environment of its employees. So to take those types of information and say, well, we're going to engraft on that program some presumptions that apply to certain audiograms, those afterwards, is in my, would be an impractical solution and one that could not be achieved. I don't think Mattson could have, after he's no longer an employee, Mattson could not send him back for part of the OSHA conservation program or obtain it. What happens is what happened in this case. Claimant goes about getting an audiogram, the employer gets an audiogram, and then the parties try to resolve it on the basis of that evidence. So how much money is at stake here? Oh, I haven't run the dollars, but the answer is double. Whatever the claim is, the alternative argument, the 20% plus 1% for the tinnitus is, I don't know the amount, but it's a double factor because a claimant asserts that it's the average or some variation between the 39 and 36. I suspect that in the year 2000 this worker had a compensation rate around $800. It's coming back to me now, $500. So it would be, I'm guessing it's, I'd have to look at the numbers. Okay. Any further questions? Thank you, counsel. We'll give you a minute for rebuttal even though there needs to be time. And I can address the last point a little more specifically. The compensation rate was indeed, just as Mr. Hugg posits, about $800 a week, and for 21%, that's 41 weeks. So we're talking about roughly $32,000 that he was entitled to under the ALJ's award, and it's close to double that if the later audiograms are used. Okay. I think my essential point with respect to the second question, as I've posited them in the briefs, is that no rational mind could conclude that 20% was the full measure of the loss of hearing that Mr. Hart had when he left work. That's the basic point. Now, yes, that's what he had a year and a half earlier, but it's not the full measure of what he had when he left. Now, 40% surely is an overestimation of what the impairment was when he left work. But 20%, no rational mind could look at the progression on the audiograms that are in the record and say 20% is the full measure of the impairment that he had when he left work as a result of the noise exposure. The ALJ's decision. But absent a testimony as to what the progression might be, what figure would you put it at that you think is supported by the evidence? If you say it can't be 20%, what's the amount that we're compelled by the record to find? If the ALJ is free to do this, as I said, I think it would be perfectly reasonable to interpolate, to say the progression shown, these audiograms were pretty much on an annual basis, and for the preceding five years each one showed 2% to 3% a year. The board said that in its decision, that that's what the audiogram showed the pattern was, and that pattern continued up through this last screening audiogram they did. If they'd done another audiogram a year and a half later, it would have shown, based on that pattern, there's no evidence that that pattern would not have been continued as a result of that last year and a half of exposure. So one could reasonably say, well, if it's 2% to 3% a year, another year and a half means another 3% to 4.5%. Now, if the ALJ had made that interpolation, the only question would have been, is an ALJ allowed to interpolate like that? I don't see why not, but it is not done. They all just have to find a determinative audiogram. And our point is that that last screening audiogram cannot be it, because no rational mind could believe that that's the full measure of the hearing impairment. So either it has to be, yes, you can interpolate, and 24%, 25% is a reasonable figure to pick, or you can interpolate. It has to be based on an audiogram, and now we're up to 38%, because that's the next audiogram that was done. Counsel, we've allowed you to go over time a bit. We have some other customers in the audience, so thank you very much. Thank you. Interesting case. Thank you both for your arguments.
judges: Fletcher B. , Thomas, Smith N. R.